IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | |
| DAVID W. LANDERSMAN, ) | 1:15-cr-283 (LMB) |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION

Defendant David W. Landersman ("defendant") faces a two-count indictment alleging in Count 1 conspiracy to commit mail fraud, unlawful manufacturing and dealing in firearms, and unlawful delivery of unregistered firearms, and in Count 2 theft of government property, respectively in violation of 18 U.S.C. § 371 and § 641. Indictment, [Dkt. 1] at 1, 9. Before the Court is defendant's Motion to Dismiss the Indictment or in the Alternative to Suppress Evidence ("Motion"), in which he alleges that the government violated his due process rights by destroying potentially exculpatory evidence in bad faith. The government has replied to the Motion, and evidentiary hearings were held on August 30 and September 16, 2016.[1] For the reasons that follow, defendant's Motion will be denied.

---

[1] Unless otherwise specified, all citations to transcripts in this Memorandum Opinion are to these hearings. The transcripts of Sterling Michelle Gill and Lorin Readmond's testimony are docket number 46, and the transcript of Richard "Kent" Ford's testimony is docket number 47.

I. BACKGROUND

Defendant was Director of Naval Intelligence during all times relevant to the indictment. The government alleges that defendant conspired with his civilian brother, Mark Landersman, and the then-Deputy Director of Naval Intelligence, Lee Hall ("Hall"), to secure an unauthorized and unnecessary contract for Mark Landersman to provide unregistered firearm suppressors to the Navy.[2]

In late January 2013, the Navy Criminal Investigative Service ("NCIS") was investigating allegations, unrelated to this case, that the Office of Naval Intelligence ("ONI") was engaged in improper conduct relating to the issuance of travel credentials. Def. Ex. 1. Acting on a belief that the ONI was on the verge of destroying documents related to that investigation, the NCIS obtained a search warrant for the ONI's office space in the Pentagon. Def. Ex. 1. The office consisted of one or two rooms in which there were several desks, including those for Hall, defendant, and defendant's assistant Sterling Michelle Gill ("Gill"). Motion Ex. 2, [Dkt. 31-3] at 82. The NCIS executed that warrant on Friday, February 1, 2013, in a search that continued over the weekend. While that search was being conducted, defendant, Hall, and others were not permitted to access their workspace. Ford Tr. 20:16–19; Def. Ex. 2 at 2. The entire ONI office suite is a Sensitive Compartmented Information Facility ("SCIF"); however, some of the NCIS agents conducting the search lacked a security clearance high enough to be in the facility alone. See Ford Tr. 20:13–19. In such situations, the Pentagon assigns a Special Security Officer ("SSO") to ensure that classified information is appropriately protected. See Ford Tr. 20:13–19. The SSO assigned to the February search of the ONI SCIF

---

[2] Mark Landersman and Lee Hall were convicted on November 6, 2015, and their appeal is pending before the Fourth Circuit.

2

was Richard "Kent" Ford ("Ford"). See Ford Tr. 20:13–19. Ford's office was not part of the NCIS.

On Monday, February 4, 2013, ONI staff were permitted to return to the office. In an e-mail sent that day, Ford described the SCIF as being in a "state of disarray." Def. Ex. 5 at 1. Undisputed testimony from Gill establishes that the bin for the shredder was empty when NCIS agents arrived on Friday and full when she and the others returned on Monday. Gill Tr. 21:3–22:1. Defendant, Hall, and Gill resumed working in the SCIF until Friday, February 8, 2013, when they were administratively suspended without warning and required to leave the Pentagon immediately. Gill Tr. 26:12–27:6. Although Gill's description of the shredder supports a conclusion that the NCIS destroyed documents, there is no evidence in the record that defendant noticed any missing personal items or government records during the four days he was in the office after the search. It was not until some time after defendant's suspension began that the investigation shifted to focus on the unauthorized purchase of suppressors which ultimately resulted in the indictments of Hall, Mark Landersman, and later David Landersman.

On February 11, 2013, in an e-mail to Catherine Donovan, counsel in the Office of Naval Research, defendant's counsel requested "the immediate return" of "everything taken from Mr. Landersman's office, including notebooks, calendars, files, and all other items," asking in the alternative for "an immediate inventory" of those items. See Motion Ex. 1 [Dkt. 31-2]. That email did not request either an inventory or return of any materials remaining in the SCIF. In an e-mail sent on February 14, the government refused to return any items the NCIS had seized under the warrant on the grounds that the items had evidentiary value and could not "be returned until the Assistant U.S. Attorney (AUSA) conclude[d] that the items no longer have evidentiary value and provide[d] authorization to release them." Id. For the next six months, non-suspended

3

ONI personnel were permitted to continue working in the SCIF. For example, a Commander Phan started working at Hall's desk. Motion Ex. 2, [Dkt. 31-3] at 93. There is no evidence in the record as to what, if anything, these employees may have done with defendant's work records or personal property.

No evidence was presented during this hearing that defense counsel ever requested the return of any items remaining in the SCIF until some time in November 2013. As Ford explained, Lorin Readmond ("Readmond"), an ONI intelligence specialist who continued to work in the SCIF and who admitted being a close friend of defendant, contacted the Human Resources office on Hall's behalf to ask for the return of his personal property. Motion Ex. 2, [Dkt. 31-3] at 59. Human Resources then contacted Ford because Hall's office was in the SCIF "to make sure that Mr. Hall's effects did not include any classified information." Id. According to Ford, he had "a limited amount of discretion" to destroy classified information, id. at 77, and had not been given any guidance by either the NCIS or U.S. Attorney's office about being careful to avoid "the destruction of any possible evidentiary information," id. at 81.

Before Ford and his assistant Francine Cox ("Cox") entered the SCIF in November 2013, Readmond had already separated the Hall and David Landersman's personal effects, and it was Ford and Cox's job to review the materials before they could be returned. As Cox testified, "[W]e needed to go and make sure that there were no classified documents in those personal belongings before Petty Officer Readmond delivered them to the member." Motion Ex. 2, [Dkt. 31-3] at 91. On November 13, 2013, Ford and Cox began separating defendant's personal items in the SCIF from official-use Navy materials so the personal items could be returned to the defendant. They continued that process on November 15 and finished on November 19.

On November 13, 2013, the first day that Ford and Cox were in the SCIF, the Washington Post featured an article about the suppressor investigation. Ford forwarded that article to several colleagues, commenting, "The article is lengthy, I've included the link for your review." Def. Ex. 18. The e-mail included the lead paragraphs of the article, which described three senior Navy intelligence officials having allegedly "arranged for a hot-rod auto mechanic in California to build a specially ordered batch of unmarked and untraceable rifle silencers and sell them to the Navy at more than 200 times what they cost to manufacture." Def. Ex. 18. Defendant cites to this e-mail as direct evidence of Ford's awareness of the criminal investigation into suppressors before he began his review of the materials in the SCIF.

As Ford and Cox combed through defendant's desk and files for personal items, they placed any documents marked for Navy official use into burn bags. Although Ford maintains that his supervisors authorized him to destroy such material, no documentary evidence supports Ford and his direct supervisor has testified that she only learned of the destruction of documents four or five days after it happened. See Ford Tr. 43:7–20. Readmond testified that she protested Ford's decision to destroy these materials.[3] Readmond Tr. 47:24. Ford ignored Readmond's protests, filling as many as ten burn bags with documents taken from defendant's desk and files. See Ford Tr. 44:10–11. Readmond testified that Ford and Cox looked at every file individually before determining whether to burn it. Readmond Tr. 50:5. It is undisputed that Ford and Cox earmarked for destruction any document pertaining to Navy official business, regardless of classification level, and that the majority of the material was sent to the incinerator on November 20, 2013. See Ford Tr. 35:6–7; 29:21–22.

---

[3] According to Ford, Readmond never protested, Ford Tr. 78:12–14, but Readmond contemporaneously documented those protests in memoranda for the record, Def. Ex. 39.

5

Mark Landersman's counsel, Cary Citronberg, learned of the destruction as it was taking place, emailing Assistant United States Attorneys ("AUSAs") Morris Parker, Jr., and Patricia Haynes at 4:40 p.m. on November 19, saying there was a "distinct possibility that the government (not your office) is intentionally destroying documents regarding the need for and procurement of the suppressors, and/or other exculpatory and/or material evidence that is the subject of our case." Def. Ex. 57. David Landersman's counsel, Stephen M. Ryan and Cecilia Showalter, met with Haynes and Parker to discuss that possibility the same day. See Def. Ex. 58. Although Haynes and Parker promptly spoke with the NCIS case agent, because he was at the firing range that day, and he was not aware who might be destroying documents, nothing was done that day and by the time the NICS had determined that it was personnel from the Special Security Office the documents had been destroyed.

## II. DISCUSSION

Defendant argues that the government intentionally destroyed exculpatory evidence, violating his due process rights and requiring dismissal of the indictment. Def. Memo. 14. The government maintains that defendant has failed to show both that its agents acted in bad faith and that the destroyed materials would have been exculpatory. Gov. Memo. 4.

### A. Due Process Requirements

The Due Process Clause prohibits the government's investigators from destroying evidence in bad faith when that evidence possesses "an exculpatory value that was apparent before the evidence was destroyed" and could not be obtained "by other reasonably available means." See California v. Trombetta, 467 U.S. 479, 489 (1984); accord Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Jean v. Collins, 221 F.3d 656, 661 (4th Cir. 2000). When a due process violation of this nature occurs, "the court must choose between barring further prosecution or

suppressing . . . the [government's] most probative evidence." Trombetta, 467 U.S. at 487; however, merely negligent conduct on the part of a non-prosecutorial government agent does not rise to the level of a constitutional violation. See Jean, 221 F.3d at 663.[4] Rather, the government agent must have acted "for the purpose of depriving [the defendant] the use of that evidence during his criminal trial." Id. at 663. Moreover, to prevail on his claim of being denied due process, a defendant cannot rely on conclusory allegations about the exculpatory nature of the evidence, but must show that the government's agent could have recognized the significance of the evidence when making the decision to destroy it. See Jean, 221 F.3d at 662.

B. Bad Faith

Defendant has not made a sufficient showing of bad faith on the part of the government or its agents to warrant dismissal of the indictment. There is no allegation and no evidence that AUSAs Parker and Haynes withheld exculpatory material, or that they intentionally ignored warnings from defense counsel about the impending destruction of evidence. As the record shows, as soon as they were alerted to a possible destruction of documents, they contacted the NCIS case agent. The agent was not at his duty station that day because he was at the firing range and he has testified that he had trouble identifying Ford as the relevant actor remotely, in part because Ford was not an NCIS agent. Although it would have been advisable for the Navy to have acted more expeditiously in responding to the defense's concerns, there is no indication that its failure to do so amounted to bad faith.[5]

---

[4] In contrast, when a prosecutor fails to turn over apparently exculpatory evidence, a due process violation occurs regardless of the prosecutor's state of mind. See Youngblood, 488 U.S. at 57; Jean, 221 F.3d at 660.

[5] Defendant has alleged an internecine squabble between the NCIS and the ONI, but those allegations are too generalized to support a finding of bad faith.

To the extent defendant argues that the NCIS destruction of documents during the February search also constitutes an intentional destruction of evidence, he is clearly wrong. There is no indication that anyone, including the NCIS, knew that an investigation about the procurement of suppressors would result from the search, which focused on credentials. Its agents therefore could not have been targeting a defense related to that transaction during the February search. Moreover, the defendant was allowed to return to his office after that search and in the three to four days he was in his office did not complain of any items missing from his notebooks.

With respect to Ford and Cox's actions in November 2013, as this Court found when denying Hall and Mark Landersman's motion to dismiss the indictment, there is ample evidence of "clear negligence and a failure to follow . . . a pretty clear and prudent protocol; basically, when in doubt, don't destroy." Tr. of Hearing, United States v. Landersman, No. 1:13-cr-419, [Dkt. 245] at 193:11–14 (E.D. Va. July 14, 2014); however, the Court also found that there was no evidence of "evil intent." Id. Defendant has provided no persuasive reason to revisit the conclusion that the destruction of documents resulted from Ford's negligence and Cox's failure to stop him, as most of defendant's evidence focused on Ford's failure to seek authorization to destroy the material in the SCIF, his decision to ignore Readmond's warnings, and his indiscriminate approach when identifying what to burn. Defendant also demonstrated that Ford's account of what he and Cox did has changed over time.[6] That evidence suggests someone who performed his job carelessly and then sought to evade administrative consequences from his

---

[6] Most notably, at least two attorneys in the Navy's General Counsel's office testified that they were concerned by inaccuracies in Ford's statements about whether he was authorized to destroy any materials.

8

employer, but it does not support the inference of bad faith which defendant must establish to justify a dismissal or some other sanction.

Defendant also introduced evidence supporting his view that Ford harbored a personal grudge against defendant. The government has stipulated that the defendant disciplined Ford for sexually harassing Gill in 2007.[7] Moreover, although Ford claims he was unaware of the suppressor investigation before he destroyed documents, he must have known about it, having forwarded the Washington Post article on the same day he began sorting material in the ONI office. Def. Ex. 17. Ford has also admitted that he looked at every document before determining whether to place it in a burn bag, establishing an opportunity to identify potentially exculpatory material if he were so inclined. See Ford Tr. 32:18–20.

Even in light of these facts, Ford's actions were not consistent with someone who was acting with a purpose to "deprive [the defendant] of the use of . . . evidence during his criminal trial." Jean, 221 F.3d at 662. The undisputed evidence shows that six months had passed between defendant's suspension and Ford's destruction of the material. The impetus to enter defendant's office did not come from Ford, but was precipitated by Hall's request for the return of his personal belongings. Moreover, as the following section explains, even if Ford were trying to identify relevant exculpatory material to destroy, defendant has not produced sufficient evidence that anything recognizably exculpatory was in the office when Ford destroyed the documents.

Defendant argues that because Ford burned everything related to Navy official business, it is not necessary for him to have been able to identify any particular item as exculpatory. According to defendant's theory, the NCIS would have removed any inculpatory evidence

---

[7] Ford himself denies that the incident took place and that he has any particular dislike of defendant. Ford Tr. 63:5–22; 62:20–23.

9

during its February search, so Ford would have been justified in assuming that anything left behind was either exculpatory or irrelevant. There is no evidence in the record that Ford actually believed this, and it is an implausible inference. Over the course of an investigation, evidence that initially appears benign may attain new significance, meaning Ford's indiscriminate review might just have easily jeopardized inculpatory information. Furthermore, there is no evidence that Ford sought to identify any exculpatory materials among defendant's personal belongings to destroy those as well. Accordingly, even though Ford had a reason to dislike defendant, his actions are more consistent with a negligent disregard for protocol than a desire to impede Landersman from mounting a defense. Defendant has therefore not established the bad faith required to justify dismissal of the prosecution under Jean. 221 F.3d at 663.

C. Allegations of Exculpatory Evidence

Although the absence of bad faith is a sufficient basis to deny defendant's motion, defendant also has not demonstrated that Ford destroyed any exculpatory evidence that would be otherwise unavailable. As an initial problem with defendant's Motion, he fails to provide any direct evidence as to the contents of any of the allegedly exculpatory documents that were destroyed. Defendant chose not to testify at the hearing and relied instead on the testimony of two close aides, Gill and Readmond, who were only able to provide generic descriptions of the materials allegedly destroyed by Ford and Cox. Defense counsel asserted that his client decided not to testify because he was concerned that he might be deemed to have waived his Fifth Amendment privilege not to testify at his trial. Any such fears are baseless. It is well established that testifying at a pretrial evidentiary hearing does not waive a defendant's privilege not to testify if the purpose of the pretrial hearing is to assert another constitutional right. See Simmons v. United States, 390 U.S. 377, 393–94 (1968) ("[W]e find it intolerable that one constitutional

right should have to be surrendered in order to assert another."); United States v. Ragins, 840 F.2d 1184, 1193 (4th Cir. 1988). Nor could any such testimony be used against him at trial, except for impeachment purposes if he ultimately decided to testify.

Defendant has alleged at least seven potentially exculpatory documents.[8] For the reasons that follow, none establish grounds for dismissal. First, defendant alleges that he had made a memorandum for the record describing a meeting in which he and Deputy Undersecretary of the Navy (DUSN) Robert Martinage agreed that Martinage would supervise Hall on a classified procurement project that would explain the transaction underlying the conspiracy charged in count 1. Def. Memo. 7. Although Gill and Readmond testified that Landersman was generally in the habit of making memoranda for the record, neither mentioned a memorandum related to a conversation with Martinage about supervising Hall.[9] Defendant also claims that Ford destroyed his handwritten notes corroborating that memorandum, Def. Memo. 6–7, but there is similarly no evidence that any such notes ever existed. As with the memorandum, all Gill's testimony demonstrates is that Landersman generally made notes during meetings and stored them in a green camouflage portfolio. See Gill Tr. 6:6–25. Neither she nor Readmond, the only two witnesses familiar with the contents of the portfolio, testified about

---

[8] Defendant also referred to memoranda for the record about the incident in which Ford sexually harassed Gill. The government stipulated at the August 30, 2016, hearing that the incident occurred and resulted in Ford's transfer, curing any prejudice defendant may have suffered by the destruction of these memoranda.

[9] Moreover, Readmond testified that hard and "soft," or electronic, copies of these memoranda were generally created, Readmond Tr. 52:4–5, indicating that even if defendant's hard copies were destroyed, the memoranda would be "reasonably available" by other means, through either defendant or Readmond's computer files, and consequently not a basis for Trombetta or Youngblood dismissal. Trombetta, 467 U.S. at 489.

11

handwritten notes regarding this particular transaction.[10] The evidence therefore does not support a finding that those specific notes existed, especially in light of Martinage's consistent testimony that no such meeting occurred. See Landersman, 2015 WL 6830232 at *21.

Gill did recall an "authorized use of force" document signed by Martinage approving a transfer of money to Naval Sea Systems Command, along with a memorandum explaining that transaction. Gill Tr. 10:3–17. Although defense counsel has implied that this document had some relevance to this case, Gill testified that it had no notes about suppressors on it and that "if somebody was looking for something related to this case and they were only looking for suppressors, they wouldn't know that was related to this case[.]" Gill Tr. 10:21–11:2. Without a more specific link to the facts of this case, there is no evidence that Ford, or any other government agent, would have been able to recognize the exculpatory value of such a document.

Defendant alleges the existence of another memorandum "regarding [defendant's] request to [the Navy's then-Assistant for Administration] Carla Lucchino regarding funds for the Intelligence Directorate budget." Def. Memo. 7. Once again, there has been no specific testimony about such a memorandum. In fact, when Gill was asked whether "there would have been memorandums from [defendant] to [Lucchino] or her to him about some of those same transfer issues," she responded "I know there were e-mails between them," not memoranda. Gill Tr. 16:4–7 (emphasis added). To the extent that defendant's motion is based on destruction of those e-mails, he has failed to show that they could not be obtained from the Pentagon's servers, and at the trial of Hall and Mark Landersman Luccino's e-mails were in evidence. Landersman, 2015 WL 6830232 at *3–*5.

---

[10] Additionally, if defendant planned to offer these notes as evidence at trial they would be inadmissible hearsay. See Fed. R. Evid. 801; 802.

Next, defendant argues that Ford destroyed an original or draft addendum to defendant's financial disclosure forms, Def. Memo. 7; Gill Tr. 13:13–15:24; however, there is no evidence in the record as to how such a document would help clarify defendant's financial relationship with his brother. Gill testified that occasionally "there were things that [defendant] had submitted that [the ethics attorney in the general counsel's office] would come back and say 'I don't know, but you should keep it anyway.' So it wasn't . . . kept with the file, the original papers, but [defendant] was keeping it in his file for his records." Gill Tr. 14:14–19. That testimony is too vague to establish that anything relevant to this case would have been found in defendant's private files. Additionally, Gill testified that any required financial forms would eventually have to be filed publicly. See Gill Tr. 13:17–14:19.

Another group of documents defendant has identified are "[m]aterials held by [defendant] related to the widely reported events involving Glen [sic] Defense Marine and [Department of the Navy] officials." Def. Memo. 7. There is no evidence connecting the Glenn Defense Marine events to this case, and, in any event, Gill testified that documents related to those events were not kept in the same place as the files that Ford destroyed. See Gill Tr. 17:2–3. Defendant has consequently failed to establish the relevance of these documents, or that the government destroyed them.

Finally, Readmond testified that Martinage "asked a question and made notes on" the margin of an unrelated presentation that defendant was making. Readmond Tr. 53:4–17. There was no testimony about the nature of those notes, but Readmond also testified that "the notes . . . were made from both within the [portfolio] and then notating it in a computer." Readmond Tr. 53:17–18. Once again, defendant has not shown that the electronic notes were destroyed by

the government or are otherwise unavailable. Any destruction of the hard copy therefore does not serve as a basis for dismissing the indictment. See Trombetta, 467 U.S. at 489.

In short, there is insufficient evidence in this record that exculpatory evidence ever existed, let alone that it was destroyed in bad faith and that there is no other source for that evidence. In fact, based on Readmond's description of how the office worked, there should be electronic versions of much of that evidence if it ever existed.[11] Accordingly, defendant has not met his burden of showing that any apparently exculpatory evidence was intentionally destroyed.

### III. CONCLUSION

For the reasons stated above, defendant's Motion will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 23rd day of November, 2016.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

[11] The government has advised that it requested two blank hard drives from defense counsel on September 27, 2016, so it could provide the defense with copies of Gill and Readmond's electronic files. As of October 28, 2016, defense counsel still had not provided the government with those hard drives. [Dkt. 56] at 1 n.1.

14